**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X
**UNITED STATES OF AMERICA,**


            **--against--**                              **11 Cr. 838 (WFK)**


**MICHAEL DARAGJATI,**

                       **Defendant.**
-------------------------------------------------------------------------X



# MEMORANDUM IN AID OF SENTENCING
## ON BEHALF OF
## MICHAEL DARAGJATI

RONALD P. FISCHETTI, ESQ.
FISCHETTI & MALGIERI LLP
*Attorney for Michael Daragjati*
747 Third Avenue
20th Floor
New York, New York, 10017
(212)  593-7100
(212) 758-2809 fax
*www.fischettilaw.com*

ERIC FRANZ, ESQ.
Law Offices of Eric Franz P.L.L.C.
*Attorney for Michael Daragjati*
747 Third Avenue, 20th Floor
New York, NY, 10017
Phone: (212) 355-2200
Fax: (212) 937-2217
*www.efranzlaw.com*

Andrew Mancilla, Esq.

**TABLE OF CONTENTS**

I.    **PRELIMINARY STATEMENT**………………..……………....1

II.   **DISCUSSION**

    A. LEGAL STANDARD………………………………….…..2

    B. THE PRE-SENTENCE REPORT'S RECOMMENDED
       GUIDELINES………………………………………….……...4

    C. THE OFFENSE CONDUCT……………………………….5

          1. <u>Count Two:  18 U.S.C. §242,</u>
            <u>Deprivation of Rights Under Color of Law –</u>
            <u>a Class-A Misdemeanor</u>……………………..……….....…..5

          2. <u>Count One:  18 U.S.C. §1951(a)</u>
            <u>Conspiracy to Commit Extortion –</u>
            <u>a class C Felony</u>……………………………..………....8

    D. MR. DARAGJATI'S HISTORY AND CHARACTERISTICS...11

          1. Mr. Daragjati as a New York City Police Officer………..12

          2. Mr. Daragjati as a small business owner………………..19

          3. Mr. Daragjati as a community member…………………20

          4. Letters from Mr. Daragjati's family……………………..23

    E. INCARCERATION AS A POLICE OFFICER…………………25

III.  **CONCLUSION**……………………………………………..……27

# I.

## <u>PRELIMINARY STATEMENT</u>

Indisputably a New York Police Officer[1] with a remarkable service record, former Officer Michael Daragjati comes before the Court for sentencing based on two lapses of judgment. The first was job related, while the other was the result of him trying to convince a thief to return to him his stolen property. In both cases, we respectfully submit that Mr. Daragjati let his emotions get the better of him, and in both instances he "took it too far".

Unfortunately, notwithstanding all of his good deeds, heroic acts and risks he took for the community, his transgressions and admitted failures, coupled with his inappropriate use of offensive terms, are likely to dwarf all of his accomplishments. We therefore respectfully urge this Court to evaluate this case based on the individual conduct which forms the basis for Mr. Daragjati's conviction, and to also measure this against all of his acts of benevolence and heroism in fashioning an appropriate sentence.

Finally, with regard to the offensive, and inappropriate remarks which Mr. Daragjati used to describe others, we respectfully submit that since those terms were not part of Mr. Daragjati's offense conduct, that Your Honor not put any undue weight on such comments when fashioning an appropriate sentence. On this note, we submit that actions speak louder than words, and while Mr. Daragjati surely uttered offensive and derogatory terms to his friends, there is no evidence that his offense conduct was motivated by any racial animus. The letters submitted by members of the community

---

[1] On February 24, 2012, Mr. Daragjati was terminated from his employment as a New York City Police Officer as a result of his guilty plea in the instant matter.

demonstrate that notwithstanding his offensive vernacular, he is an otherwise beloved man who dedicated himself to helping his community and doing his job.

## II.

## DISCUSSION

### A.    LEGAL STANDARD

As this Court is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), has reshaped the way a sentencing judge can impose a sentence. The sentencing court may consider the guideline range, as well as any basis to depart from that range. However, the Court is no longer required to impose a sentence within that range. In fact, the federal sentencing guidelines are but one factor among several in determining an appropriate sentence. *Kimbrough v. United States*, 128 S.Ct. 554, 574 (2007). The guidelines are only the "starting point and initial benchmark…" *Id., citing Gall v. United States*, 128 S.Ct. 586, 596 (2007).  It is the sentencing judge who has the advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a) factors. *Id., Kimbrough*, 128 S.Ct. at 574, *citing Gall*, 128 S.Ct. at 597.

In determining a sentence that is "sufficient, but not greater than necessary," the first of those factors the judge must consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. §3553 (a)(1). Without a doubt, the breadth of this factor alone extends far beyond the guidelines and implores the sentencing judge to consider the unique circumstances and characteristics of the defendant in each case. A consideration of those characteristics, along with the

remaining seven factors,[2] may render sentences that do not fit within the guidelines, yet are fair and meet the goals of sentencing set forth in §3553 (a)(2). *See United States v. Ovid*, 09 CR 216, slip op. 3 (EDNY, Oct. 1, 2010).

Therefore, the Court may not simply presume that the Guidelines range is reasonable. *Gall*, at 597. Rather, the Court must make an individualized assessment based on the facts presented.  From its unique vantage, the Court may conclude that, despite the guidelines, "in a particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing. . ." *Kimbrough*, 128 S.Ct. at 570, *citing* 18 U.S.C. § 3553(a).  The "not greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law" and "provide just punishment for the offense."  18 U.S.C. § 3553(a).  Indeed, as the Supreme Court suggested in *Gall*, a sentence of imprisonment may not promote respect for the law if it appears unduly harsh in light of the real conduct and circumstances of the particular case. *Gall*, 128 S.Ct. at 599; *see also Rita v. United States*, 127 S.Ct. 2456, 2465 (2007) (observing that district court may consider arguments that "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

---

[2] The seven other factors are (1) the nature and circumstances of the offense; (2) the history and characteristics of the offender;(3) the need for the sentence imposed to reflect the goals of sentencing set forth in § 3553(a)(2); (4) the kinds of sentences available; (5) the Commission's policy statements; (6) the need to avoid unwarranted sentence disparities among similar defendants who commit similar crimes; and (7) the need to provide restitution to victims. *See* 18 U.S.C. §3553 (a).

B.      **THE PRESENTENCE REPORT'S RECOMMENDED GUIDELINES**

On January 24, 2012, the defendant pleaded guilty to Counts One and Two of the two-count information. Specifically, Mr. Daragjati pleaded guilty to extortion in violation of 18 U.S.C. §1951(a) (Count One) and a civil rights violation under 18 U.S.C. §242 (Count Two).

### COUNT ONE: EXTORTION

| | |
|---|---|
| Base Offense Level (§2B3.2(a)) | 18 |
| Express or Implied Threat (§2B3.2(b)(1) | +2 |
| Bodily Injury (§2E2.1(B)(4)(A)) | +2 |
| Organizer/Leader (§3B1.1(a)) | +4 |
| Adjusted Offense Level | 26 |

### COUNT TWO: CIVIL RIGHTS VIOLATION

| | |
|---|---|
| Base Offense Level (§2H1.1(a)(3)) | 10 |
| Under Color of Law (§2H1.1(b)(1)(B) | +6 |
| Adjusted Offense Level | 16 |

| | |
|---|---|
| Grouping (§3D1.4) (1 unit) | 0 |
| Acceptance of Responsibility (§3E1.1(a) and (b)) | -3 |
| **Adjusted Offense Level** | **23** |

Having no prior criminal record, Mr. Daragjati is in criminal history category I. **This yields a recommended guideline range of 46 to 57 months.**

4

C.      **THE OFFENSE CONDUCT**

1.      **Count Two:  18 U.S.C. §242, Deprivation of Rights Under Color of Law – a Class-A Misdemeanor**

While this is not the more "serious" of his two offenses of conviction, we address this Misdemeanor count first since it is accompanied with inflammatory racial remarks which we are concerned could be the proverbial tail that wags the dog.  The subject of numerous media articles, this misdemeanor offense has garnered much more notoriety than Mr. Daragjati's extortion which is contained in Count One of the Information to which he pleaded guilty.  Notwithstanding the media's focus on the racially charged language that was uttered by Mr. Daragjati (in private and not to the victim of the civil rights charge) we respectfully urge this Court to not allow this misdemeanor to determine the ultimate sentence in this matter.

**Notwithstanding Mr. Daragjati's use of racial epithets, the facts surrounding the arrest of John Doe # 2 do not support that the arrest was racially motivated:**

First and foremost we submit that this Court should not be distracted by the government's claim that Mr. Daragjati's use of inappropriate and offensive remarks following the arrest of John Doe #2 render him a racist. We concede that the remarks are offensive, racist remarks, but the mere uttering of them does not necessarily define Mr. Daragjati as a racist.  Regardless, we submit that the relevant issue before the Court is not whether Mr. Daragjati is a racist, but rather, whether his arrest of John Doe # 2 was **racially motivated.**

Significantly, Mr. Daragjati did not plead guilty to being a racist or that his conduct was racially motivated. The plea agreement offered by the government does not

include racial motivation as an element of the offense and Mr. Daragjati maintains that his "trumping up" of the charges against John Doe #2 was not based on racial animus but simply John Doe #2's display of disrespect for then - Officer Daragjati.

There is no claim that at any point during the entire street encounter with John Doe #2 Daragjati uttered foul or racist terms. Indeed, the allegations contained in the complaint in this matter detail a street encounter, followed by a verbal exchange between Daragjati and John Doe #2 which precipitated the subsequent unlawful arrest. Paragraphs 9 and 10 of the complaint make clear that Daragjati did not violate the civil rights of John Doe #2 because of any racial animus – he did so because he believed John Doe #2 was being disrespectful:[3]

Para. 9:      After the frisking, John Doe #1 engaged in a verbal exchange with the defendant MICHAEL DARAGJATI, during which John Doe #1, in part and substance, complained about his treatment by DARAGJATI and asked for DARAGJATI's name and badge number. **During this exchange, DARAGJATI let John Doe #1 walk away and continue down the street.** As John Doe #1 walked away, he continued to complain about his treatment by DARAGJATI, **including shouting insults** at DARAGJATI. At that point, DARAGJATI and his Partner crossed the street, re-approached John Doe #1, placed John Doe #1 under arrest and handcuffed him.

Para. 10:     At the time of this incident, no one was on the street in the vicinity of the defendant MICHAEL DARAGJATI and John Doe #1 except for DARAGJATI's Partner and three other plainclothes NYPD officers from a different unit, who had arrived in the area by chance during DARAGJATI's verbal exchange with John Doe #1. The three plainclothes officers observed DARAGJATI and his Partner cross the street, re-approach John Doe #1 and place him under arrest. At no time, before or after DARAGJATI

---

[3] The discrepancy in the John Doe #'s is due to the fact that the complaint labeled the victim of the civil rights violation "John Doe #1" but the plea agreement and PSR label him "John Doe #2."

> and his Partner approached John Doe #1 to arrest him, did
> John Doe #1 resist arrest in any way or attempt to escape.

Thus, it is clear that Daragjati had initially allowed John Doe #2 to walk away from the encounter and it was only due to John Doe #2's continued verbal attack of Daragjati that the subject arrest occurred. *See PSR at* ¶13 (John Doe #2 "began insulting the [Mr. Daragjati].");  *Id. at* ¶17. ("[a]t the 120[th] Precinct Station House, Daragjati told John Doe #1, in part and substance, that John Doe #1 could have gone home that night, but that Daragjati really did not like being disrespected.").   Thus, Daragjati did not violate the civil rights of John Doe #2 due to his race, but as a result of his disrespect.

Was he wrong to arrest John Doe #2 for disrespecting a police officer? Absolutely, and he is ashamed that he allowed his emotions to lead him to make the arrest. However, John Doe #2's arrest was in no way motivated by "racial animus."

The government's reliance on various taped excerpts which occurred subsequent to the arrest of John Doe #2, while racially charged, do not prove that Daragjati's offense of conviction was motivated by any racism. These comments, only one of which describes John Doe #2 in pejorative terms, were after the fact, offensive remarks to a friend and were not terms uttered at John Doe #2.   Notwithstanding the other referenced remarks (wholly unrelated to John Doe #2), we maintain that Daragjati's private use of offensive terms should not overshadow the sentencing proceeding. While juicy fodder for the media, we submit that it does not provide a significant basis to enhance what we submit should otherwise be a sentence well below the advisory guidelines range.

2. **Count One:  18 U.S.C. §1951(a) Conspiracy to Commit Extortion – a Class C Felony**

We respectfully submit that in this federal courtroom we should not let this claim of racism be the tail that wags the dog of this case, for the most serious offense of conviction of this case stems from Mr. Daragjati's frustration with the criminal justice system in its inability and failure to help him achieve justice with regard to the theft of his commercial snowplow equipment. Mr. Daragjati's frustration with the criminal justice system arose out of the fact that Mr. Daragjati did follow the proper channels necessary to take when one is a victim of a crime. He filed police reports and spoke to members of law enforcement but was told that there was nothing they could do. As a result, Mr. Daragjati himself confronted the individual whom he believed stole his property and the person acknowledged that he had stolen the property from him. There was no doubt in Mr. Daragjati's mind that he had identified the responsible party and that this man was capable of returning the stolen property to him. The manner in which he confronted the individual was admittedly wrong, improper, and is regretted, however, the context of this extortion warrants a considerable amount of leniency.

Indeed the very origin of Mr. Daragajti's passionate response to get his snow plow back evokes a degree of sympathy. Mr. Daragjati had purchased the plow for roughly $5,000 and in the winter of 2010-11, his investment proved to make a meaningful difference in his yearly income. Supplementing his salary as a New York City Police Officer, the money he earned via his snow plow business allowed him to provide a financially secure future for his wife and children. It allowed him to finally

make investments that would provide a steady stream of income and permit him to save for his daughters' college education.

Unfortunately, his snow plow was an easy target for John Doe #1, a reputed thief in Staten Island. In early March 2011, Mr. Daragjati's snow plow was stolen. Through various informants and friends in Staten Island, Mr. Daragjati discovered not only who the likely culprit was, but that the thief had a long record of stealing equipment from residents of Staten Island and transporting such equipment to Pennsylvania to be sold.[4]

Mr. Daragjati initially contacted the authorities in an effort to secure a lawful arrest of the individual. He filed a police report for his stolen snow plow but after speaking to his fellow officers and the District Attorney's office, he was told that there simply was not enough evidence to prosecute the case. Frustrated with the response he received, and feeling as though the system had failed him, he wrongfully decided to take matters into his own hands and confront the individual who he believed stole his property.[5] Although Mr. Daragjati is extremely remorseful for deciding to take the law into his own hands, we submit that the fact that he initially sought relief through the criminal justice system warrants consideration insofar as it reveals his lack of immediate reliance upon criminal means to obtain what was rightfully his.

In addition to Mr. Daragjati's initial lawful approach, we submit that the *type* of extortion present in this case warrants leniency. There is no doubt that the vast majority of extortions that will come before Your Honor will be of the garden variety, where a

---

[4] Indeed, a search warrant was executed on John Doe #1's home only weeks before Mr. Daragjati confronted him about his stolen plow. We believe that at the time of the confrontation, John Doe #1 had a warrant out for his arrest for possession of stolen property. Upon information and belief, the week after Mr. Daragjati confronted John Doe #1, John Doe #1 turned himself in to the authorities.

[5] While Mr. Daragjati concedes that he was later informed that John Doe #3 was the actual culprit, instead of John Doe #2, Mr. Daragjati contends that they were in the same crew and conspired together to steal his plow.

defendant wrongfully uses force or threats of force to obtain property that does not belong to him. Indeed, most cases that come before the Court will most likely resemble the kind of criminal who pursues individuals or local establishments and demands "protection money" or some sort of weekly payment "or else." These are the type of criminals whose "living" consists of stealing the fruits of another's labor.

The defendant that now stands to be sentenced before Your Honor is anything but that kind of individual who steals from another or who takes that which does not belong to him. The man who comes before the Court is industrious and hard-working. He is that individual whose hard work and perseverance paid off and who finally began to enjoy the fruits of his labor. As the letters below discuss, submitted by friend and family on Mr. Daragjati's behalf, Mr. Daragjati worked 18 hour days. He would work the exhausting job of a New York City Police Officer as part of a select group of officers in the anti-crime unit who were tasked with combatting the harsh reality of the streets. The job demanded 100% of his focus as he was often confronted with dangerous situations. After his shifts as an officer, he would immediately go to work in his construction or snowplow business. He did what he needed to succeed as a small business owner and give to his family what he had always dreamed. Indeed, Mr. Daragjati's motivation for committing the instant offense grew directly out of his pride in owning his own business and what he had been rewarded with as a result of his hard work. Although wrong, he was in his mind defending what he had worked so hard to achieve.

Although we recognize that the Hobbs Act punishes the use of force or threats of force *regardless* of the defendant's claim of right to the property, we submit that there is an important distinction to make between the type of person who threatens a thief in an

10

effort to have that thief return property that he stole and the type of person who enters a restaurant to shake down the owner for $5,000 which that owner rightfully earned. We submit that the distinction between these two types of people warrants a significant amount of consideration and for Mr. Daragjati a measure of leniency because clearly these two types of crimes should not be similarly punished.

Finally, it bears noting that Mr. Daragjati never intended for John Doe #1 to get injured. On March 3, 2011, during a consensually recorded phone call, Mr. Daragjati told the confidential source that the meeting with John Doe #1 would only be a "verbal" meeting. *Complaint*, at ¶28. Unfortunately, the meeting was not limited to a verbal confrontation as Mr. Daragjati had intended. Rather, one of the other males who had accompanied Mr. Daragjati punched John Doe #1 when John Doe #1 made a sudden movement which that male perceived as a physical attack on Mr. Daragjati. Mr. Daragjati concedes that he arranged for the other males to be present and is therefore responsible for their conduct, but we submit that despite Mr. Daragjati's anger and frustration with the situation, he intended to only speak to John Doe #1, never to cause him any physical harm.


**D.    MR. DARAGJATI'S HISTORY AND CHARACTERISTICS**

The individual that now comes before Your Honor to be sentenced is a man with an enormous support group of not only his immediate family, but of friends, community members, fellow police officers, construction workers and customers. The man the character letters describe is a funny, light hearted, loving individual who accepts everyone with open arms. He is a man who worked 18-hour days, two jobs, and

supported a wife and three daughters. This is a man who sought to help his community and did so each and every day- proudly, and without hesitation. This is a man who lived the American dream, who planted the seed of his own business and tended to that business until it flourished. He was an individual who managed to balance a multitude of different roles. As his brother Mark writes, "We would always teasingly tell him that he has "ADD" but the truth of the matter is that Mike worked so hard, and had so many things going on at once, that it was almost impossible to keep them all organized in his head." *Ex*. "A."

We received over 50 letters from friends and family on behalf of Michael Daragjati. We reviewed each and every letter and they all describe the same man, a man who put every ounce of energy into his work and his family. After carefully sifting through the letters, we have selected those we believe are most telling and provide for the Court a window into who Mr. Daragjati really is. From these letters, we have extracted various excerpts that provide an accurate cross-section of the content within all the letters we received.


1.      **Mr. Daragjati as a New York City Police Officer**

The sentencing guidelines before this Court are the proverbial barometer used to decide where within or without those guidelines the Court should sentence a defendant. Those guidelines are just advisory as the Supreme Court has held in *United States v. Booker*, 543 U.S. 220 (2005), rightfully so because those guidelines do not account for the otherwise heroic acts that Mr. Daragjati has embarked upon for the last eight and a half years of his life. Throughout those eight years Mr. Daragjati proved to be an

outstanding police officer. Below are only a few excerpts from his performance evaluations since he began working for the New York City Police Department in 2003.[6]

His very first evaluation, from the period between December 30, 2003 to April 30, 2004, states that Mr. Daragjati "represents the police department in a favorable way." Moreover, he was rated as competent or highly competent in twelve performance areas which include community interaction, apprehension/intervention, and victim/prisoner interaction. Significantly, each report thereafter reveals that Mr. Daragjati was nothing short of a stellar New York City Police Officer.

- For example, the evaluation for his performance between October 30, 2004 and April 30, 2005, states "[h]e handles sensitive situations with poise and tact." *Id*. The report goes on to state, "P.O. Daragjati's performance exceeds basic requirements…His job performance is considered to be above standards." *Id*.

- Mr. Daragjati's evaluations for 2006 state "[o]fficer demonstrates unique effective approaches to apprehending career criminals," and goes on to state, "[h]e is a very active officer who has been directly involved in several gun arrests throughout the year." *Id*.

- Mr. Daragjati's 2010 evaluations state, "P.O. Daragjati complies with the department's policy regarding professionalism, courtesy and respect. He displays a positive drive/initiative for police work and is an asset for the boro-crime unit." *Id*.

In addition to his professional evaluations, listed below is just a sampling of some of the heroic deeds that illustrates Mr. Daragjati's above average performance as a police

---

[6] Annexed hereto at Exhibit "B" are Mr. Daragjati's performance evaluations.

officer. Indisputably, Daragjati put himself in harms way and risked his life for the betterment of neighbors, members of the community, and Staten Island.

- On February 19, 2011, Mr. Daragjati arrested a man who ingested PCP and went on a stabbing spree- stabbing three individuals, including a 16 year old boy. All the victims were African American. Mr. Daragjati scoured the streets for the perpetrator, located him, and affected an arrest. He then accompanied the 16 year old victim at the hospital and stayed with him for hours until his mother arrived. We note that Mr. Daragjati was recommended for Cop of the Month award for his excellent police work in this case. *See Ex.* "C"

- Mr. Daragjati has made a multitude of arrests of highly dangerous people, including the arrest of Ronald Fanelli, the infamous serial burglarer who was sentenced to 12 years in state prison, and an individual who stabbed a civilian in front of the courthouse. The later was charged with attempted murder.

- Mr. Daragjati put himself in danger on multiple occasions to protect the community. By way of example, Mr. Daragjati chased a man through Park Hill who was carrying a loaded .380 handgun. Mr. Daragjati finally caught the man and the man attempted to shoot Mr. Daragjati. Mr. Daragjati was able to subdue the man and make an arrest.

Suffice to say that white or black, regardless of race, Mr. Daragjati sought to do his job properly. There is no shortage of people of color who have come forward to write letters on his behalf to demonstrate that Mr Daragjati did not exhibit views of racism.

Instead, their letters reveal a police officer hell-bent on helping members of the community and doing his best to clean up crime from the streets of Staten Island.

Retired NYPD Sergeant Jamie Cafaro, one of Mr. Daragjati's supervisors, describes him as "one of the hardest working men I have ever known." She tells the Court what kind of police officer Mr. Daragjati was. She writes:

> In February 2006, I was introduced to Michael as the newest member to my Anti-Crime team. He was by far, the most energetic and talkative Officer I had ever seen. Within the first few months of working with him, I learned that Michael is a workaholic, who took great pride in his work, is extremely loyal and surprised me with his high level of generosity. A natural born comedian, who has a very strong faith in God, makes him genuinely unique.
>
> I worked very closely with him during many robbery, burglary, assault and gun arrests, some of which he received Department Recognition Medals for. Throughout many extremely dangerous situations, Michael never showed fear or abandoned his co-workers when faced with imminent danger or death. What is not, officially documented, is the way Michael would constantly go into his own pocket and buy beverages, snacks and meals for his prisoners. In the spring of 2006, while processing an arrest, Mike came to me and asked if he could "go to the deli" besides the precinct we were in. I responded with "sure, what do you need?" He stated, "I wanna go buy this guy a sandwich". I was slightly taken back by the gesture, and informed him meals were provided a few hours later for all prisoners. Michael replied "he's not a bad guy, he made a mistake and he's hungry, I don't want to make him wait 5 hours to eat", and proceeded out the door. Through the years I watched him do this over and over again. Due to our geographical area of employment and the 911 calls we received, many of his prisoners were African American or Hispanic, and were ALL treated with the same professionalism and humanity. In 19 years on the force, I had never seen an officer displayed more compassion and generosity to those in custody. This quality allowed Michael to gain respect and establish a rapport with detainees, which generated trust and information regarding other problems and crimes occurring within the city. Many crimes were prevented due to his actions. This trait can only be described as a pure asset in police work.

*Ex.* "A."

Albert Vitarelli, a member of the NYPD for the past 7 years and a close friend of Mr. Daragjati's describes an experience he had with Mr. Daragjati that still "astounds" him today. He writes:

> This particular incident happened in late winter, approximately March of 2010, it was chilly and rainy out; we had all just finished our shift. As I proceeded to go home on my normal route as I would routinely do, I noticed Michael pull away a moment earlier than me. As I proceeded along the highway I noticed Michael's pick-up truck pulled to the side of the road, along with two other vehicles; in front of all those vehicle's, I immediately noticed another vehicle which had been involved in some sort of accident; it was flipped upside down and on fire. What my eyes witnessed next was nothing short of remarkable; I witnessed Michael and two other Samaritans without hesitation reach into this burning vehicle, unsnap the mans seatbelt and pull this unconscious individual to safety. What was even more astounding was how Michael dealt with all this, once all emergency personnel had arrived on scene, there goes Michael in his pick-up truck, continuing home without hesitation. That night Michael didn't stay around to get his name in the paper or receive praise from the unknown man's family. Michael just kept moving.

*Ex.* "A."

Francisco Caggia, Mr. Daragjati's partner for the past five years, considers Mr. Daragjati his best friend. He describes one particular experience he shared with Mr. Daragjati on the force, which he believes demonstrates who Mr. Daragjati truly is. He writes:

> My Name is Francesco Caggia and I'm Michael's friend and also his partner in the Patrol Borough Staten Island Anti-crime team where we worked together for over 5 years. I'm a 18 year veteran of the NYPD and have had numerous assignments in the NYPD, but none as fulfilling as my last 5 years working with Michael. As a result of working with together we were able to effect hundreds of arrests, taking some of the most notorious criminals off the streets of Staten Island. We made numerous arrest involving firearms, robberies and burglaries as well as quality of life arrests. One particular arrest stands out in my mind, it was a triple stabbing with one of the victims being a minor. The other two victims did

16

not wish to cooperate with the police at the time, and the mother of the minor victim was in a state of shock that the perpetrator of this vicious crime would not be punished for his crimes. When Michael was made aware of these circumstances he assured the minor victim and his mother that he would do everything in his power to help. Michael spent hours in the hospital explaining to the other victims, who were able to identify the perpetrator and did not wish to cooperate that without their help there would be no justice for the 15 year old victim, and that was unacceptable. The other victims understood what Michael was explaining to them and soon cooperated with the investigation resulting with the Staten Island District Attorneys office charging the perpetrator with 3 counts of Attempted Murder as well as other charges. I firmly believe that if not for the caring and professionalism displayed by Michael, the result of this incident would have been very different.

*Ex.* "A."

Police Officer Timothy Harasek tells the Court how Mr. Daragjati influenced his

work as a police officer in New York City. He writes:

It has been a privilege to have worked with Mike as a member of the NYPD. He, having five years seniority with the department, has been a teacher and mentor in my journey to service the people of Staten Island. If I needed help, or questions answered he never hesitated to help me. On many occasions I have worked with Mike on the streets, and he always handled himself with courtesy, professionalism and respect to any person in need. He is a police officer I wish to emulate.

*Ex.* "A."

Retired N.Y.P.D. Sergeant Michael Brown describes for the Court why he chose

Mr. Daragjati for the specialized plain-clothed unit. He writes:

It was because of this professionalism and racial sensitivity, that I selected Michael for duty in the "Conditions Unit", which is a specialized "plain-clothed" unit for which only the top performing police officers are selected. The field training assistant I assigned to Michael was P.O. Omar Smith, an African-American. Michael and Omar developed a close personal as well as professional relationship. Michael had close personal relationships with all his colleagues, many were African-American and Hispanics with whom he socialized. Michael always treated everyone with respect

17

regardless of race. I never heard him make a racially derogatory comment in all the time I knew him.

*Ex.* "A."

Leslie Daragjati, Mr. Daragjati's mother, provides a heartfelt letter about her son and the kind of man he is. Her letter sheds light on his capacity for empathy and perhaps what led him to choose a career in law enforcement. Remarkably, she includes an essay she wrote for a college English class in 1995, which describes Mr. Daragjati. The essay describes how Mr. Daragjati had a difficult time in school because "[h]e hated to sit still and did not concentrate for long." However, "[o]ne day that all turned around." She described:

> Michael was in the seventh grade when he announced that he had to write an essay about the 'Homeless on Staten Island' for a contest. Immediately I began planning. A few days later I produced an armful of library books on the subject so we could start his essay. Mike stopped me short. "Mom, I handed my essay in today," he said. I was stunned. "But Mike," I exclaimed, "I did not even correct it." I was worried it that it was not good enough. A few days later he came home from school and announced that his essay was one of the two in his class picked to be entered into the contest. That evening at a school meeting the principal explained why it was picked. Apparently he wrote the essay from his experiences of meeting homeless families with my husband. My husband often meets families from shelters whom he places as tenants in his rental apartments. "He wrote from his heart not from a book," she said.

*Ex.* "A."

Jak Daragjati, Mr. Daragjati's brother, tells the Court about two separate incidents when Mr. Daragjati was younger in which his property was stolen and how those incidents are what inspired Mr. Daragjati to become a police officer. He explains that each time Mr. Daragjati's property was stolen in the past the police were unable to help him recover it or find the thief. In no way attempting to justify Mr. Daragjati's actions, Jak reflects on his brother's situation. He writes:

18

> The ironic part of Michael's story is, the very thing that drove him to being a cop is the same that made him become a criminal. I could remember the day his snowplow was stolen like it was yesterday. He came running into my office which is just down the block from his lot. Angry but calm, he contacted everyone with security cameras on our one way street. Unfortunately, nobody seemed to care to put any effort to search. As he approached his fellow officers, the result was the same he had heard his entire life: "Sorry, there is nothing we can do."

*Ex.* "A."

## 2.    Mr. Daragjati as a small business owner

Mr. Daragjati excels not only as a police officer, but as a small business owner. His company, Essential Renovations Inc., provides renovation, construction, and snow removal services to residents throughout New York City. Mr. Daragjati's customers range from commercial premises to family residences. One customer, Ms. Stacie Watkins, a guidance counselor with the Department of Education of the City of New York at Port Richmond High School writes about why her and her husband John, a Fire Marshal with the FDNY, decided to hire Mr. Daragjati to renovate their home:

> We found Mike to be highly professional and courteous; he always called us back if we had questions or concerns about the work. He walked us through specifically what would be done and how it would be completed. Mike explained to us things that many of the companies would not in regards to price, work and time frame. His polite and friendly disposition, as well as his honesty in terms of what needed to be done and what really did not need to be done was greatly appreciated.

*Ex.* "A."

Domenica Puleo (a.k.a. "Mimma"), a school crossing guard in Staten Island and who works for the 123 precinct, provides for Your Honor a truly amazing story that exemplifies Mr. Daragjati's compassionate nature. She writes:

> Judge let me tell you I saw Mike's true colors last year February 23, 2011. He has been a great friend to my husband and my family but on that day I saw who Mike really was. That was the day my house burned down. My son was sleeping and thank God he woke up and had gotten out. I arrived to the house, seeing my house all burnt, destroyed, and we lost everything. Mike arrived to the house finding me hysterical crying and he hugged me and said "Mimma don't worry, its going to be OK, I will rebuild your house new for you and told me and my family to stay with him and his family until he rebuilt for me.

*Ex.* "A."

### 3.    Mr. Daragjati as a member of the community

Jonathan Herbst, a close friend of Mr. Daragjati's that has known him for over eight years, describes how Mr. Daragjati has helped him and his family. He writes:

> Before I left on my deployment to Iraq my sister was having an engagement party to which Michael was invited. When he came in my grandmother had just passed out on to the floor due to a heart condition but Mike was there to step in and help resuscitate her. He was the first one on the phone calling 911 and calming down my elderly grandfather. Mike then rode to the hospital and spent all night there with us. Mike also came to my side and my family's side on other occasions and that is why I call him my brother. In 2004 I was deployed to Iraq in support of Operation Iraqi Freedom; after a couple of months in country I became the first NYPD Officer to be wounded since the war began when I was wounded by an Improvised Explosive Device set on the roadway. It tore through my HMMWV and instantly killed my gunner and my buddy sitting next to me. I was blown out of the vehicle and knocked unconscious, my right arm was completely crushed and I broke my back and had shrapnel and burns throughout my body. On top of everything else that had happened, my girlfriend left me while I was in the hospital for another cop in the precinct. But throughout all this my friend Michael, my brother, was by my side and my family's side. Mike never left me when I was depressed about what happened to me and did anything my family asked of him. Mike stood by me in all my recovery and rehab; he never gave up on me or anybody else he encountered.
>
> I deployed again to Afghanistan in 2007 and was involved in one of the largest battles since the war began in 2001. But again Michael was there to console my wife and family. To this very day, from where I am writing right now away on my 4[th]

deployment and heading back into Afghanistan Mike is still there for me and my family.

*Ex.* "A."

Another close friend of Mr. Daragjati's, Anthony David, describes Mike as a "family oriented, loyal, and genuinely a good, decent person at the core." *Ex.* "A." He states that Mr. Daragjati "has been a devoted friend and has always over extended himself to me and my family like as if we were of his own." *Id.* Even more, Mr. David states, "[b]eing first generation Filipino immigrant and coming from a different walk of life, Mike never held this difference as a cause or reason to treat me differently." *Id.*

Thomas Boemi, Mr. Daragjati's father-in law and retired New York City Firefighter, provides for the Court an example of how Mr. Daragjati is always there to help family and friends. He writes:

> I was doing a home project and Michael stopped by to see what was happening. I was asking questions and picking Michael's brain for information and before I knew what was going on he took the kitchen wall down and within an hour he was back from the store with all the supplies and materials I needed to complete my project. That's who Michael is. I can always count on him to be there for me and my wife.

*Ex.* "A."

Patrick Walsh, Mr. Daragjati's wife's godfather, considers him to be a part of his extended family and describes how Mr. Daragjati helped when his wife passed away. He writes:

> Michael is and always will be a part of my extended family. When my wife Barbara passed away almost two years ago, I remember him being at the wake everyday. He was always asking me, how can he help and was there anything he could do for me and my family. He showed a deep and real concern for myself and my family. As a matter of fact, on the day of my wife's funeral, Michael arranged for a police escort. There was a very large

> turnout. He never asked me, he just did it. I will forever be
> grateful. That's the kind of guy he is. Always there with a helping
> hand.

*Ex.* "A."

Patricia D'Albero, a friend of Mr. Daragjati's who has known him for roughly five

years, describes for the Court a time when Mr. Daragjati helped her through the suicide of

her fiancé. She writes:

> Michael was also there for my family during a very difficult time.
> After my divorce I met and fell in love with a man. We lived
> together for 7 years. One day I came home and found him with a
> bullet in his head with no explanation. He was very depressed and
> although I tried to help him, he still took his own life in the end.
> When I tried to locate his family, it was a nightmare. No one cared.
> Michael was there to talk to me and my family who was devastated
> over this incident. He stopped by my home many times to make
> sure my children and I were doing okay, and also helped me
> straighten up my house and get things back in order after the
> incident. I had many questions because my fiance was not the man
> I thought he was. Michael always showed professionalism, care,
> concern, and courtesy towards me and my family. He was never
> judgmental and was always more than willing to help.

*Ex.* "A."

Anna Varella, a 72 year old who only knew Mr. Daragjati briefly when he worked

at the Boro-Crime Unit below the apartment in which she resides, gives the Court one

very simple example of Mr. Daragjati's compassion that speaks volumes about his

character. She writes:

> When he just got assigned here, he did not know me at all. Once
> we got to know each other he would always stop and talk to me.
> He knew I had a bi-racial 15 month old grandson who passed
> away. He came in the next day with a hand carved cross that he
> made out of wood. I was so taken by emotion that I cried. Then
> and there I knew he was a good hearted person.

*Ex.* "A."

Mr. Patrick Perry, a friend of Mr. Daragjati's that has known him for about eight years, tells the Court about a time in his life after his son's death during which he was extremely distressed and Mr. Daragjati helped him and his wife get through the hardship. He writes:

> Three months prior to my son's death I had an open heart surgery and triple bypass in February 2010. In the aftermath of the surgery and my son's death 4 months later Michael Daragjati offered with a generous heart and compassion the use of his grandfather's home in North Carolina for several weeks to allow myself and my wife to grieve in private. For this we will be forever grateful.

*Ex.* "A."

## 4.    Letters from Mr. Daragjati's family

Nicole Daragjati, Mr. Daragjati's wife and mother of three girls, describes for the Court how Mr. Daragjati dedicated himself to his work to provide for their family. She writes:

> Michael worked eighteen hour days. There were days when my husband couldn't eat or function because he was exhausted. You can ask anyone in my neighborhood, friends, family...everyone would ask "Where's Mike"?...I would robotically answer "Working"!  Whether it was construction or the NYPD, he gave both jobs 100% of himself, and never complained.  It was just his way of life, to work hard now, and enjoy the fruits of his labor upon retirement.

She tells the Court what kind of small business owner Mr. Daragjati is and how he treats his employees.

> Michael was also a compassionate businessman. He always showed a genuine concern for people and would take good care of his workers, keeping them busy with construction or snow work. He knew they had families of their own to feed. When business was slow, my husband would feel terrible if they didn't make their usual salaries. He could've easily saved money by simply paying his employees only for the jobs they were contracted for, but instead he offered them odd jobs around our house to keep them going. He and his workers always had a mutual respect for each

23

other and I believe that is why his business was so successful. He never treated them like they were his employees...but friends...always looking out for them. He developed a unique bond with his foreman. He trusted him and Michael was trusted in return. He also calls him "brother". His wife had a baby and now our children and his son are like family. There is no divide because we come from two different nationalities. We are family now.

Finally, she tells Your Honor how Mr. Daragjati has decided to harness his experience as a police officer and now as a convicted felon serving time in federal prison, and use it to help others. She writes:

During our last visit at MDC, we discussed the possibility of him volunteering as a mentor or "big brother" to troubled teens. He could use his experience as a police officer and as someone who has been incarcerated to work with kids that are struggling and heading down the wrong path. He is an excellent speaker and has always captured the room with his vibrant storytelling. I do believe he could make a difference in the community through the lessons he has learned from this experience. If he was able to come home, Your Honor, I have the utmost confidence and faith in Michael and the lives he could impact through community service. Michael often says to me that "Maybe this happened for a reason." He has a gift for bringing out the best in people and showing others that with a lot of hard work and perseverance, anything is possible.

*Ex.* "A."

Michael's daughters Adriana and Samantha both wrote letters to the Court in which they express a longing for their father and a request that he come home as soon as possible.

Finally, Mr. Daragajati expresses in his own words how he feels about his misconduct. In Mr. Daragjati's letter to the Court he writes:

Your Honor, I am so sorry for what I did. Words cannot describe the shame that I feel from my actions.  On a daily basis I look at myself and my surroundings here in the MDC and ask myself how did this happen.  I am not in denial, I know exactly how this happened.  I am here because of my own misconduct, and I have to live with that. I betrayed my family by engaging in wrongful acts

24

which have caused them all irreparable harm.  It was my doing, and I do not blame anyone else.  I accept full responsibility for what I have done, but simply urge you to accept that I am a broken man who wishes to return to my family so that I can work and provide for my children.

*Ex.* "D."

## E.  INCARCERATION AS A POLICE OFFICER

Immediately following his arrest and the denial of bail, Mr. Daragjati was placed in solitary confinement in the Special Housing Unit of the Metropolitan Detention Center in Brooklyn. Mr. Daragjati was placed in segregation ostensibly to safeguard him from other inmates. Although this confinement may be safe, it certainly results in a more punitive form of incarceration. There is no question that because of the notoriety of the case, the defendant will continue to have to endure some form of segregation which is certainly more punitive than the ordinary prison sentence. Whether Mr. Daragjati faces an extraordinary risk for abuse in prison or he is segregated by the prison for his own safety, his incarceration will be much more difficult to bear. He will in essence do "harder time" than other inmates and we submit that this certainly warrants a degree of leniency.

Courts have indeed recognized that Police Officers are susceptible to abuse in prison. In *Koon v. United States,* 518 U.S. 81 (1996), the Court approved a downward departure based on the defendants' status as police officers and the media coverage of the case, which presented the risk that they would be unusually susceptible to prison abuse. *Id.* at 111-12. Additionally, the Second Circuit in *United States v. Lara*, 905 F2d 599 (2nd Cir. 1990) reasoned that in order to protect an inmate who is susceptible to abuse, the Bureau of Prisons may place that inmate in segregation. Although such treatment may be done to protect the inmate, segregation results in "a more punitive period of

incarceration." We also note that Judges in this district have routinely given more credit for time served in the MDC and MCC because of the onerous conditions.

Here, Mr. Daragjati's status as a former New York City police officer who made inflammatory racial remarks that were published and repeated time and time again in the media, makes him unusually susceptible to prison abuse. This case generated media coverage at the time of the defendant's arrest and, increasingly, at his plea, and may do so again following sentencing. It is highly likely that his fellow inmates would learn of Mr. Daragjati's status--indeed it is inconceivable that it could be concealed for long--and it is certain that he would be abused for it, for the misdemeanor. The potential for susceptibility for abuse in prison in this case is extraordinary.

Because of such security concerns, Mr. Daragjati spent the first eleven days in prison in solitary confinement.[7] He was confined from dawn to dusk, in a 6' X 9" cell for a period of 23 hours a day and only allowed infrequent 1 hours visits to the roof. This tremendously stressful environment made those eleven days equivalent of several weeks of traditional confinement. Although he was then moved to general population with the other inmates, he lives in constant fear and anxiety. A prison sentence will consequently be far more onerous for Mr. Daragjati than it would be for the average defendant.

In addition, we note that Mr. Daragajati is likely to be designated to an institution outside the current geographical location in order to minimize the potential that a defendant had interacted with a particular staff or inmate who is familiar with the allegations in this case. Removal to an institution far from home will make it virtually impossible for Mr. Daragjati's family to visit him. This is particularly troubling for Mr. Daragjati who has found prison incredibly difficult to bear in light of the constant fear

---

[7] He was confined in the special housing unit from October 17, 2011 to October 28, 2011.

and anxiety he faces on a daily basis. Not only will this cause Mr. Daragjati a substantial amount of stress, but it will take a devastating toll on his wife and three daughters who have come to visit him weekly at the MDC.

Finally, this Court should not overlook the impact that incarceration in general has had and will continue to have on his family. Indeed, his 8 months of incarceration have already exacted a significant hardship on his daughters. His oldest daughter, Adriana, has been particularly affected by his incarceration. As the PSR states, "her teachers have noticed that the defendant's legal situation has negatively affected her attitude, and that she 'always asks when daddy is coming home.'" *PSR*, at ¶62. The report goes on to state that since January, Adriana "is unfocused, which is causing her to not participate and when she is called up; she does not know how to answer the questions." *Id*. at ¶63. In addition, Mr. Daragjati's youngest daughter Alexa unfortunately suffers from learning disabilities which require a greater amount of attention and treatment. Mr. Daragjati's incarceration not only puts an enormous burden on his wife to manage and assist her in overcoming her disability, but it has exacerbated her condition. Needless to say, the sooner he can return home the sooner he can assist his wife in tending to these issues.


<u>CONCLUSION</u>

It is unfortunate that this man stands before this Court under these circumstances and that is why we say that this was a lapse of judgment. He did not wake up and say, "how can I violate someone's civil rights?" He also did not decide to go to some dry cleaner, restaurant, car wash, or any other local establishment and say, "I'm going to

shake them down for protection money." Instead, his offense of conviction of extortion, stems from a simple desire to obtain his own property, to have it returned to him by an admitted thief. Again the manner in which he did it was certainly not appropriate and ran afoul of the law, but this Court should certainly consider the context of that encounter in determining whether or not a below guidelines sentence is appropriate for Mr. Daragjati.

For the civil rights violation in which the victim spent 2 nights in jail, Mr. Daragjati faces a maximum of one year in federal prison, but the Court should not overlook the relative brevity of the victim's incarceration, and the fact that Daragjati admitted his guilt in a timely fashion – pre-indictment.  Furthermore, while not controlling, it bears emphasis that when asked by Newschannel 11 what he thought would be the appropriate amount of incarceration for Mr. Daragjati, John Doe #2 responded, "Jail is not no place for a man. You know. Jail is cages. Cages is meant for animals. And he is still a man, first and foremost."[8] Additionally, when asked about the appropriate punishment for Mr. Daragjati, John Doe #2 indicated that he simply wanted Mr. Daragjati to no longer be a police officer. *Id.* Indeed, John Doe #2 stated he did not believe Mr. Daragjati should go to jail even though he stated earlier that Mr. Daragjati is "clearly a racist." *Id.* Certainly some consideration must be given to the victim's determination of what he believes is an appropriate sentence in this case – that Mr. Daragjati lose his job – which he did.  Anything additional (considering the 8 months he has already served) for the civil rights violation would be, we respectfully submit, greater than necessary.

---

[8] The video footage may be viewed at: http://www.wpix.com/news/wpix-false-arrest-victim-of-daragjati-speaks-out,0,6879496.story